I can still say good morning to the panel. I think I'm the last one to be able to do that. Dean von Kallenbach, on behalf of the appellant Hickory Wind, I'd like to reserve two minutes, if I may, for rebuttal. The rules of civil procedure require parties to give a full and complete disclosure of the facts and the theories that support their claims. And the district court has wide latitude to enforce those requirements. What we're dealing with here is a situation where we contend the appellate court abused its discretion by failing to exercise its discretion to enforce the rules of civil procedure. And that occurred, unfortunately, throughout this entire case. Our first contention is that the appellate court improperly and incorrectly applied the law in entering its sanctions order in a manner that, first of all, put the burden of proof on us to prove prejudice, as opposed to requiring the party who failed to disclose to prove prejudice or harmlessness. Second of all, that the court later refused to enforce its sanctions order when the party failed to properly supplement its interrogatory answers, and in the summary judgment motion disregarded the party's answers to discovery and denied the motion. And finally, when it came time for trial, where the plaintiff had failed to supplement their admittedly incorrect discovery responses, and we brought a motion limiting it to limit them to what they had told us, the district court essentially threw up its hands and said, I'm tired of this whole mess. Let's get to trial and let the appellate court sort it out. So that's why we're here today, to let Your Honor sort this matter out. Early ‑‑ excuse me. As to the first issue of where the appellate court abused or, excuse me, the district court abused its discretion, the plaintiff failed to provide any Rule 26A disclosures whatsoever regarding their claim. No witnesses, no facts, no identification of damages. The defendant, Hickory Winn, sent out detailed interrogatory saying, tell us what your claims are. Tell us what you're claiming for. In response to that, the plaintiff said, we have an oral contract for $145,000 for the sale of goods. We have two witnesses who have knowledge, and we have one document that supports our claim. Well, in reliance upon this, we also had a fairly large counterclaim against the plaintiff, and we decided in a mediation, because our counterclaim was covered by their insurance policy, to enter into a settlement. And the reasons we did so would take more than the time I have here to discuss them, but essentially we made a decision that it made sense for us to accept the settlement, to simplify the trial, because we felt, based upon their responses to discovery, they didn't have a claim. Their claim was barred by the statute of frauds, because it was an oral claim for the sale of goods more than $500. They only had two witnesses. They only had one document. So we made a decision to go ahead and accept that. Shortly before trial, the plaintiff came forward, gave us their witness list. They listed a number of individuals who had never been identified before. They had a new theory of what their claim was going to be, which was not barred by the statute of frauds. They put forward 30 or 40 documents which we'd never seen before. At the time of these settlement discussions, how far after the filing of the complaint was that? It was substantially after, Your Honor. It was a mediation that would have been a couple months before trial. I seem to recall it was May, and the trial would have been in June. So it was quite a way down the road. The reason I'm asking that is that, I mean, obviously what the fight is about is an unpaid repair bill. And if you're fighting against the person who's done the repairs, it seems improbable in the extreme that they're only going to ask about sale of goods. Well, Your Honor, you know. So if you're thinking this is going to stay a sale of goods case, you're thinking this is a really odd way to fight a case, to file a claim about. I totally agree, Your Honor. And the problem was we, again, there were no Rule 26a disclosures, so they didn't say here's what our claim is. And we sent them detailed interrogatories saying, look, what are you claiming for? Explain to us how you arrive at your number, what's the basis for your claim, what amounts are you claiming for, how do you calculate them, et cetera, et cetera. And we got back this very, very limited response saying this is what our claim is, and this is what it's based on, and here's all that it's based on, and here's the only evidence we're going to present at trial to support it. Yeah. And so you're saying there's kind of a detrimental reliance you settled for less than you otherwise would have settled for because you thought that the district judge was going to punish them? Well, in a sense we did, Your Honor. At that time, was there a sanctions order out against it? No. You were just kind of hoping for one? Well, no. What happened, Your Honor, is we, so we had these discovery responses from the plaintiff saying this is what our claim is. We took discovery. We went to a mediation. Now, we had a fairly large and complicated counterclaim, which would have required us to bring a number of experts up to Alaska, a number of witnesses, so on and so forth, and we, and I don't want to go into all the discussions that took place between us and our clients and also at the mediation, but we made a decision that given what they were arguing, as far as their claim goes, it made sense for us to settle our counterclaim, take the money from the insurance company, and then go to trial on their claim, which, again. But how is your counterclaim worth more or less depending on what their claim is worth? Are you telling me that there was a different, there was a relationship in terms of what your claim was worth, your counterclaim was worth? Actually, I'm not saying that there's a relationship. In other words, you might have sold out too cheap no matter what, then, if you're saying you sold out too cheap. No. Maybe, Your Honor, maybe we did or maybe we didn't, but I think you are making the same mistake the district court made, which is saying to me, prove to me you were prejudiced. And that's where the difference is. I'm not even asking for proof. I'm just asking for a bare explanation as to how you're prejudiced. Well, the way we were prejudiced, Your Honor, is this contract, obviously it's an oral contract, does not have an attorney's fees provision. If we had believed that Marcom was going to go to trial on a legitimate claim with a number of witnesses, a lot of documents, and be able to sustain their claim, then we would have bit the bullet and gone up to Alaska and paid for all these experts to go up and other witnesses, and this would have been a fairly long and complicated trial. I see. That is to say you would have been able to cover some of your litigation costs because you had to do it anyway. Right.   And I apologize, Your Honor. I'm not trying to dance around the question. It's just for a while to get there. I'm a little slow, but I think I got it now. Okay. And so when the – when Marcom said this is all our claim is, we decided, well, you know what, okay, we'll take less money because it's not going to cost us very much. But at the time you settled, you made any motions for discovery sanctions? No, because they had answered discovery, Your Honor. We had sent them discovery, and they had answered discovery, and they said this is our one document. Okay. We said great. So then we get to just before trial where they give us our witness – their witness list, and they give us their list of exhibits, and they say we now have this huge number of witnesses we're going to call to trial we've never told you about before. We have all these documents we've never disclosed to you before, and we're going to introduce them at trial. And, by the way, here's our whole new theory. It's not a sale of goods anymore. It's goods and services. It's outside the statute of frauds. We brought a motion in limine to exclude that. And the trial judge found that the plaintiffs had completely ignored the letter and spirit of the Federal Rules of Procedure. He called their conduct careless at best. Yet he refused to grant our motion to limit them to what they had identified in their discovery responses because he said we had failed to meet our burden of proving prejudice. That was error. The burden is clearly on the party, in this case Marcom, who wants to introduce evidence, wants to introduce facts that they have not disclosed in response to discovery. They have made no attempt to meet that burden. In fact, even in their responding brief, they say essentially, well, the burden is on Pickery Wynn, and they didn't meet their burden of proof. Well, we don't have that burden of proof. We didn't want the information admitted. They did. They must prove harmlessness or justification. They made no attempt to prove either. So the Court erred in placing that burden upon us. What the Court did require them to do, which is most at issue in this appeal, is to fully supplement their discovery responses. So we go forward. The Court continues the trial date. We send them another letter that says this is in detail. This is exactly what we want for your supplementation. They provide a supplemental discovery response, which say we have eight claims. They're worth $41,000. We take more discovery. We file a summary judgment motion saying, okay, they told us they have eight claims. They're worth $41,000. We want summary judgment. At the summary judgment hearing, counsel for Marcom said, well, I made another mistake. Our claim really isn't only eight claims, and it's really not just for $41,000. It's for a lot more. The judge, the district court judge, apparently was as frustrated as I was at the hearing because he said to counsel for Marcom, why can't you give a straight answer? Why can't you tell them what you're claiming for in this lawsuit? Why can't you explain to them how much you're asking for and your causes of action? Counsel didn't have an answer for that. However, the district judge didn't go one step further. He didn't sanction them for their misleading and inaccurate responses to in compliance with his original sanctions order, and he denied our summary judgment motion, which was based entirely on their responses to discovery. We don't really know why he denied it because his order was fairly cryptic, saying essentially, I'm going to leave all of this for trial and resolve it then. So now we have a situation where we've had the original sanctions order require them to fully supplement their responses. We go to a summary judgment where we've relied upon their responses to file a summary judgment motion, and Marcom's counsel says, you know what? They're wrong again. They're incorrect. We're claiming for a lot more. Now we have a trial 11 weeks away. In the period between the summary judgment hearing and the actual trial date, Marcom's counsel did nothing. Rule 26E says they have an obligation to supplement discovery responses that they know to be incorrect and misleading. The sanctions order required them to fully and completely supplement their discovery responses to give us complete and accurate answers. They've already admitted at the summary judgment hearing their answers are wrong, but they do nothing. So before the trial date, we file another motion limiting. Say, Your Honor, they told you at the summary judgment hearing that their answers were wrong. We've been waiting for some supplementation. None has come in. So, Your Honor, we want you to limit them at trial to these eight claim items they identified in response to your sanctions order. And on the Friday before trial, we got a response in from Marcom's counsel where he said, well, you misunderstand. It isn't eight items. It's ten items. It's not eight through 15. It's eight through 15 plus 6 and 6A. So the weekend we prepared for the case on those eight items plus the additional two, we get up to Alaska Monday morning. We walk into court, get in front of the judge, and say, Your Honor, okay, we've got this motion limiting, Your Honor. We want you to limit their case to eight items. They've now come forward and said it's ten items. Okay, we're prepared to go to trial on ten items, Your Honor. We want to get it over with. Let's try this case. And at that point, Marcom's counsel stands up and says, no, no, no, it's not ten items. It's not eight items. It's essentially 80 items. It's all of these things we're claiming for, Your Honor. At that point, we're kind of standing there going, you know, Your Honor, this is not what they have said in response to discovery. This is not what they even said in response to the motion limiting filed three days ago. And the court at that point said pretty much, look, I want to get on with this case. We're going to try it, and if you don't like it, take it to the appellate court. And he let them go to trial on all of their claim items, which had not been previously disclosed in response to discovery. And bottom line is we were not prepared to try that case. As it turns out, where we really got hammered by the district court was that we had not brought one of our principals, a man named Dennis Cox, who had been involved in this project. And the court in his findings said that he found that Mr. Cox was notably absent for trial, from trial, and that had he been there, obviously, he would have given testimony regarding a number of the claims they were making, and that because he wasn't there, the court essentially inferred that Mr. Cox would have testified adversely to us. Kagan. Were some of the claims to which Mr. Cox would have testified among the eight or ten claims? No, and therein lies the problem. The eight or ten claims we're dealing with here, Your Honor, we knew what their claim was for. We knew what the dollar amount was for. And we didn't need Mr. Cox to fight over those eight or ten items. Those were pretty straightforward. Those were pretty much mathematical. What did you do? How much work did you perform? What was the cost? And they were agreed to. And so when it became apparent that the district judge wanted to go to trial for the remaining claims, that in your view are, I don't know how many more, 70 or 80 more claims, and it became apparent to you, I guess, at that time that it would be nice to have Mr. Cox there, but he's out fishing, did you ask for a continuance? Did you ask for any arrangement by which he could present evidence? Well, in terms of asking for a continuance, it seemed pretty obvious to me that the district court was going to try this thing. The short answer is no, you did not ask for a continuance. The short answer is no, I did not ask for a continuance, one, because I think the court would grant it, two, because I didn't know until we went through the trial how much I would need Mr. Cox to be there, because I didn't know what their claims were. And third ---- Well, once you've heard them put on their case in chief, did you make any attempt to say, you know, I now realize, given what you've allowed them to put on, that Mr. Cox has some very important testimony. Can we make arrangements for him to testify by telephone, by some other mechanism? He's out there fishing, Your Honor. Did you make any such attempts? I did not ask for a continuance at that point, Your Honor. Or for some other arrangement by which he might provide evidence? I did have one of my other witnesses explain to the court where Mr. Cox was, which was in the middle of the hearing. But my question is different. You didn't make any attempt to get in front of the judge Mr. Cox's testimony by continuance or otherwise? I didn't, Your Honor. And again, still, I didn't even know until I received the judge's findings how much weight he put on the absence of Mr. Cox. He certainly didn't say anything during the course of the hearing to the effect that, well, you know, I know Mr. Cox isn't here. It's very important. He should have been here, whatever. They put on their case. We did the best we could to rebut it. And when the findings came out, I found out how much emphasis, in hindsight, the court attached to Mr. Cox's absence. The point being, I shouldn't have been in that position to begin with. We, from the very beginning, sent discovery requests which were pretty clear. We've laid them out in our briefs as to exactly what we were asking Marcom to tell us. You've got a contract. You're claiming that there are all these changes. Okay. Identify every change you're claiming for. Tell us how much you're claiming for. Tell us why you're claiming for it. They never did that. They identified eight. And they said, We're claiming for these eight, and here's how much money we want. And that's all that they did. Okay. You know, I suspect we're going to get a rather entertaining story from the other side, and with you having three medicines, so why don't we save all that for the I think we have your argument at hand. Thank you, Your Honor. You were mistreated and abused. Well, that's one way of phrasing it, but I think my client was much more mistreated and abused than we were. Let's hear it from the other side, and then we've saved enough time so you can have enough time to respond. May it please the Court. Todd Zilbert, Lieutenant Senator Murphy, appearing on behalf of Plaintiff Appellee Marcon. I don't find it actually entertaining, and I don't expect to entertain the Court. I shouldn't have used that word facetiously. I apologize. No, I understand, and I appreciate that. I'll get to Mr. Bumble later, but I'd like to begin with some context. Mr. Cox and Mr. Johnson were the owners of the Hickory Wind, and they went to Marcom to request that it lengthen their fishing boat and do a lot of additional work to the boat, enlarge the shaft alley so that when a bigger engine was put in later, they could have a larger shaft to drive the propeller, and a new fish hold, move a lot of items around in the boat, do a lot of new piping modifications, a lot of work, a lot of labor. Counsel, we understand that that's true. The question is, why didn't you dominate that amount of work in response to the discovery requests? Again, I will go to context. As Mr. Brown testified, there was no dispute about the invoice for a year and a half, and what counsel from Marcom believed was actually in dispute was the counterclaim. The boat left the yard after a great amount of last-minute hurry, last-minute details, because the owners were very worried that they weren't making their fishing season. The boat leaves, it's in the Bering Sea, the propeller falls off, they've got a claim against Marcom, it's an involved claim. It's difficult, it's going to require a lot of analysis of what they did or did not lose in their fishing season, why the propeller fell off, it was involved. When you look at the initial disclosure, your initial reaction must be, they can't be serious about this. The first comment in this initial disclosure is, since we believe that there's no, or we understand that there's no dispute about the debt for the invoice, we will focus this, or in fact, only address the counterclaim. Counsel blew it, no doubt about it. Counsel blew it. That's not an appropriate initial disclosure. And going still to context, we have a lawyer, Oregon lawyer. In Oregon, there's no expert disclosure, there's no interrogatories, there's no discovery cutoff in the State court. Counsel, let's fast forward then. When the court told you, or told the parties, okay, this is not responsive. You have to supplement, and then Hickory Winn gave explicit, a letter explicitly stating, here's what we want, A, B, C, D. Very specific, then why weren't those responded to? I believe they were responded to. I don't believe, and I can't argue that they were responded to fully. But they were responded to, and I believe that counsel's belief was everything that describes in detail what happened to increase the job cost from $249,000 to $405,000 is laid out in the job cost summaries. There's examples in supplemental excerpts of record at 10 and 13. If you look down those, you see each item, you see the straight time, overtime, materials, subs, and a total. And you can see this grow from the start of the job in November to the end of the job in February, and how the cost ballooned. Well, then how did you get to the point before trial where there were 10 job items that Marcom was claiming for and that expanded to 80 job items at trial? Well, I disagree with that characterization. If you look at, for example, SCR. Which part do you take issue with? Do you take issue with the fact that you designated 10 numbers of items that were going to be at issue at trial? Do you take issue with that part? There are, I believe, a total of 23 items. But when you did the job numbers. When you said the job numbers in response to the discovery request, how many job numbers did you articulate? I believe they articulated eight job numbers. With two more on the day of trial. With two more. No, actually it was well before the day of trial. It was in the supplemental trial brief. And I believe what happened was defense counsel said they would accept that as a supplemental disclosure. That was the weekend before trial? The 6A? 6 and 6A? I can't remember the exact date, Your Honor. As of the day of trial, how many job item numbers were at issue? Well, they were all at issue. That's the point. The job cost group. Defense counsel, in terms of the discovery responses, how many job items were at issue have been responded, have been reflected in the discovery responses? You could read the discovery responses to say there were eight, just the change order items at issue, number 15 through 23. But counsel always understood and appreciated that this claim was for the growth of this job from item one through the last change order. The job cost summary shows for each, I mean, when you look at the items, there's a number of sub. But you'll understand that if you didn't answer the explicit discovery request that asked you to calculate the numbers and show each job that you're claiming for and the amount that you're claiming for each job. How would counsel know? It should have been done that way. I agree. It should have been done that way. Did your request for damages increase in dollar amount from the filing of the complaint to the time you went to trial? No. No? No. You were always after $145,000 or so? Plus interest, yeah. Plus interest, yeah. The total, there was an invoice for $145,000. And you say you owe us the additional $145,000 and you said that at the beginning and you said it at the end. Exactly. There was no effort to mislead. There was no effort to hide the ball or not produce a document at the last minute. That did happen. It's ridiculous, frankly. Don't you agree that the purpose of discovery is to find out what the basis is for the claim? You're not suggesting, are you, that if you put a number in the complaint that you don't have an obligation to support that number by specific itemization? No. No. I don't suggest that. But I do suggest that just before the first trial date, it was scheduled for trial in late July, July 2nd they had a conference. And before this conference, in June, counsel for Marcom, plaintiff, had produced the job cost summaries, all of them. And there was a hearing on why this had been late to produce. And there's a full description of what the claim is about there. And the court appropriately delayed the trial until the following February and ordered supplemental interrogatory responses. Following that, in September, there was a deposition of Mr. Brown. Mr. Brown was the main witness at trial. He testified for more than a day. The other witnesses testified very small amounts. If you compare the transcript, you'll see. It's very small. Mr. Brown testified at length. In the supplement, in the deposition of Mr. Brown in September, the only questions that were asked went to the motion for summary judgment. It was just items 8 or, excuse me, the eight items 15 through 23. Because counsel, I submit, did not want to get into the total job cost. Because counsel believed there had been such an egregious error, beginning with completely inadequate Rule 26a initial disclosures. That to demonstrate that they knew exactly what was at issue would be fatal. They didn't have a defense. Mr. Cox, who lived on site, who watched the work being done, who approved the work, who asked Marcom to fax a job cost summary to his lender so that they could see the value that had been added to this boat, knew that the work was done, the labor was done, the value had been added, and didn't dispute the bill, and didn't come to trial. And counsel never asked for a setover, didn't ask that the trial be scheduled outside of fishing season, didn't ask for a setover so that Mr. Cox can come after fishing season was ended. And in fact the point of the discovery rules, then? What's the point if you don't have to comply with the discovery rules? Then why are they there, then? You do have to comply with the discovery rules. And a sanction was absolutely appropriate in this case. And we are not appealing that. But what exactly was the sanction? The sanction was $18,000 plus halting of the interest that was due under the contract for the period from the initial disclosure, well, I think it was actually from the inappropriate discovery responses, until the time of the actual trial. That was the first thing. That was for the first failure. Yes. But the failure to supplement in accordance with the sanctions order was never dealt with by the district court. I think the district court found that the other, that the defendants knew what the claim was all about. It's not the standard under 37C. It's not whether the defendant knew. The standard is whether or not there's justification for the failure to disclose and whether or not there was harmless. It's not whether the defendant knew. Agreed. And that's why a sanction under 37C was perfectly appropriate. Should have been done, was done. Not for the, not for the disclosure on the day of trial? I think that the sanction covered the entire work. And what do you rely upon to say that the sanction that was imposed initially covered the failure to comply with the sanctions order? Because in the final order after trial, the court acknowledged, I believe, the sanctions that had been issued initially and deducted that from the judgment. He had not forgotten that sanctions were appropriate. He had not forgotten that counsel had blown it. And he made sure that there was a remedy. And he made sure throughout that there was a remedy. He bent over backwards to try to be fair to both sides and make sure that this case was tried on merits. And I'd like to say, if you look at the Klonoski case and if you look at the actual language of 37C, the in lieu of language is there for a reason. And the reason is the trial court is the appropriate place to look at the context, to look the lawyers in the eye, to hear defense counsel say, I like Mr. Murphy. I feel sorry for Mr. Murphy. The trial court has the discretion to say, yes, there was inappropriate conduct. I am not going to order what is tantamount to litigation ending sanctions. Counsel, is there discretion under Rule 37C? Yes. Yes. The in lieu of language is discretion. That is the point. Sanctions, yes. Absolutely appropriate, yes. No appeal from us on the sanctions. What they're saying is you don't get to try your case on the merits. You don't get to. And the trial court didn't agree with that. The trial court said, you know what, we can't tell that you would have mediated this case differently. I mean, in every case where there's a discovery failure, you could have a party saying, well, if they'd handed over that document, we would have settled. Prove otherwise. Who can prove otherwise? In every case, you lose because almost a year before trial, you made your initial disclosures. And I mean, on the face of the document, it's clear you blew it. Can you help me? And maybe I'm going to need help from both sides. The movement from 8 or 10 items up to about 80 items, I don't understand what's meant. Can you give me examples of what's in the 8 and 10 category and examples of what's in the additional 70 or so category? Yes, I can. If you look at the supplemental excerpts of record at 10 and, again, at 13 or 15. Tab 10 or 13. Tab 10. This is a job cost summary or a bid summary. It's referred to both ways. What page am I on at tab 10? In the SER, it's just page 10 at the bottom. Oh, I'm sorry. In SER. It's very thin white. I'm sorry. I'm doing the wrong thing. Okay. Okay, if you turn to page 10. It's got some black arrows on it. These were used as exhibits in Mr. Brown's supplemental deposition and also in response to the motion for summary judgment. If you look, you'll see item 1, fab work platform on small cradle, weld plates together for mid-body. Do you see what I'm reading? Yes, yes, I'm reading. Under title? Yes. Okay, if you look down, the next one is prefab install mid-body sections. Yes. Well, there's a whole bunch of work that's required to prefab and install mid-body sections. And the ST hours in the next column over from title lays out what the number of hours at the contract rate were. And then there's overtime hours. There's materials. ST stands for what? I beg your pardon? ST hours. Straight time. Yes. And then OT is overtime. Okay. And there's a markup above straight time for the overtime. There's materials. There's subs. I can't remember to tell you the truth what MMW stands for. And then there's a price. And these are the ADA items. This job cost summary is shared with Mr. Cox on a weekly basis. Counsel, the problem is this is a bid summary, which is compiled before the job is done. And then if it's underestimated or overestimated or some of the work that was bid is not performed, it's adjusted. So it's difficult for one to look at a bid summary and determine what amount is being claimed. Again, I get to the context. The boat comes in in November, the boat's out by February, and they're working feverishly to get this job done. And every week, Mr. Brown and Mr. Liddell are pounding numbers into this spreadsheet and sitting down with Mr. Cox and saying, okay, we did this this week, we did this this week. And Mr. Cox says, no, no, no, we had a subcontractor do that, and so we put in a zero for that item because we didn't do that work. And this is the kind of discussion that was had at Mr. Brown's deposition. These, the two that are reproduced in the SER, the job cost summaries, the arrows point to zeros where numbers were taken out. And on the summary judgment motion, counsel for Marcom apparently misunderstood what was actually the dispute. Counsel, don't you see that's why it was so important for the discovery responses to be specific? If there was this kind of confusion, an informal adjustment to the document. But if you look at the last job cost summary, the one in February, which is the one that begins on SER 15, the number at the end of that job cost summary is the same number that was the invoice amount, less the $260,000 payment. Now, what page are you on? I'm sorry. If you look at page 19, this is page 5 of 5 of the February job cost summary, and there's 405,570 is the total. Yes. Okay. If you looked at the prior job cost summary, that was a $384,000 job cost summary. It was dated 6th of January, 2000. Now, when it says bid summary up here in the upper left-hand corner, this sounds as though it's not actually the bid anymore. It sounds as though you're adjusting this. They're tracking the work with it. So this is not really a bid anymore. This is a sort of an adjusting sort of add-ons or, you know, change order included as this goes on? Exactly. They are doing this, and Mr. Brown justified their length. Now, in a way, that's just trying to get me to understand the substance of it, but I want to get back, I guess, to follow on Judge Rollinson's questions. I mean, at what point are these things produced for the other side so they can see? I mean, do they have these from the beginning? Do they get these only during trial? I mean, what's happening here? At the latest, these were all produced by June 2002 before the July 2002 original trial date. At the latest. There are no documents that are handed over to them, no relevant documents that are handed over to them after that period? I'm sorry, Your Honor. Yes, there were relevant documents that were handed over later. I believe the record shows that they were handed over in December. And what those items were, as I understand the record, are supports for these numbers. In other words, Exhibit 23, I believe, material requisition sheets that identified what the actual materials are that go into the materials column. Yes, there were supporting documents that were not handed over. That would be responsive to a request for production of documents, but that would not be responsive to an interrogatory asking how you calculated the amounts. Yes. The statute of frauds issue, several times counsel said that they were surprised with a new theory. I submit that they were not surprised with a new theory. The problem that they were struggling with was they had been handed a defense by an error in an interrogatory response that said materials instead of labor and materials, they were handed a statute of frauds defense. They didn't have a defense before. Mr. Cox knew that this work was done, and Mr. Cox failed to appear at trial to deny that the work was done. Thank you. Thank you very much. Thank you. Can I ask you this as we get started? What was the essence of your defense? Well, the essence of our defense, Your Honor, and that's part of the reason the discovery was so important, is that A, we didn't authorize the work, B, the work wasn't actually even performed, or C, it wasn't performed properly. To put it in context. And was that your defense from the beginning? Well, our defense from the once well, our defense changed depending on what sort of claims they were putting forward to us. To put this in context, as counsel would say, this was a lump sum contract for doing a certain scope of work. Once we got going on the project, we deleted a large number of items that had been in the original scope. We said don't do those things. Then other things were added in that they did do that were not part of the original scope. Is it true that Mr. Cox was basically on-site as the kind of de facto supervisor? Absolutely he was on-site. There's no question he was on-site. And your defense basically is that either the work wasn't done or some of the work you're billing for we did not authorize? Wasn't done, wasn't authorized, wasn't done correctly. And was that basically your defense from the get-go? It was our defense, well, from the get-go once the court said we're going to trial and supplement your responses. So we started trying to find the information. I'm looking at this complaint that says you've paid us $267,000. You owe us $145,000. And I'm looking here at $405,000. From the beginning, you know that there's an underpayment on the invoice under their theory of the case by $145,000. Absolutely. So what's your theory of the case from the beginning? Well, our theory of the case was where are you coming up with $145,000? That's point number one. As counsel said, you know, they gave us this final invoice in February of 2000. We were already up fishing in Alaska in February of 2000. Mr. Cox, we had left the site in the middle of January. So this final invoice for $405,000 was prepared after we were all gone from the shipyard. That's number one. One of the things I'm trying to get at is whether or not you should have been able reasonably to foresee fairly early on that if they're asking you for work you claim either wasn't done or was done badly and your Mr. Cox was there during the entire time, I should think from the beginning you know he's your key witness. Well, yes and no, Your Honor. And here's part of the problem. Counsel says we had a trial on the merits. Well, we had a trial on merits that were different than those that they disclosed in their discovery responses. You know, as the Court's already noted, you know, and as counsel admits, well, yeah, I guess you could read our discovery responses as saying we're going to trial on eight claim items. Great. We have eight claim items. We explored those in detail. I did take the deposition of Mr. Brown, their contract manager, and I went through those eight claim items and I had them establish for us how much money are you claiming for these eight items. It came up to $41,000. And I had them go through the entire math of the project to figure out where we were. What was the contract baseline? Did you ever ask him are you claiming for other items? How are you getting the $145,000? I went through what they told us. I took out the interrogatory responses and I said. I'm asking you a slightly different question. Did you ask him how did you get to $145,000? I'm only up to $40,000. I probably didn't, Your Honor, because I relied upon their discovery responses. I think you're trying to play gotcha with them. You're saying, listen, you've only answered this narrowly and I'm darned if I'm going to let you expand it by asking questions, so I'm going to stick you with it. Well, I guess the question, Your Honor, is this. Who has the responsibility under the discovery rules? I, you know, when the judge entered the sanctions order, the original sanctions order and said, look, you guys are not complying with the rules of civil procedure. Fully supplement your responses. I sat down and wrote a five-page letter to opposing counsel and said this is what I want. Don't have to supplement all your interrogatory responses. These are the most important ones. These are the critical ones. And one of them was show me your math. Show me every item on this original scope of work that was deleted and how much money was taken out for that. Show me every item that was put back in and show me how much you're claiming for that so that I can understand what you're claiming for. Now, that was my game of roadmap. I said show me. And in response, they come back and say we're claiming for eight items and eight items only. And if I'm not allowed to rely upon that, Your Honor, then, as Judge Rawlinson points out, what's the use of discovery? It's not my burden to make sure they're right. It's their burden. Okay. Let me ask you this final question, Your Honor. Yes, please. Tell me why the summary judgment ruling is not moot. It is not moot, Your Honor, because the Court didn't make a ruling based upon, apparently upon the lack of facts, that there was a factual dispute. The facts that we used to support our summary judgment motion were their discovery responses in their entirety. We said here they are. Here's what they told us in discovery, Your Honor. But the Court did a little differently than you. The Court didn't hold them strictly to that evidence. The Court looked at the whole record in determining whether or not there might be a material issue of fact. Which the Court could easily do. Well, the Court could do that, Your Honor, but that's not what the Court did. What happened was, and this is in the briefs, at the oral argument on summary judgment, opposing counsel said, Your Honor, I made a mistake again. The responses I gave in discovery are incorrect. We're claiming for more than these eight items. So that could raise a material issue of fact. Well, actually it can't, Your Honor, because I'm entitled to rely on a summary judgment motion upon their sworn testimony in discovery responses, and they are not a ---- But the Court has to examine the whole record. When the Court is looking at a motion for summary judgment, the Court has to look at the whole record and does not limit itself to the discovery response. I will grant you that, Your Honor. And we dispute that there's anything in the record that they produced in opposition to the motion that created a material issue of fact. And indeed, the rule in the Ninth Circuit is, and all other circuits is, you can't create an issue of fact in opposition to a summary motion that contradicts your prior testimony, and that's what counsel was trying to do at the hearing. All right. Thank you, Your Honor. Thank you very much. The case of Marcom v. F. V. Pickery Wind is now submitted for decision. And the long-suffering litigants in Luther Bartholomew v. Crowley Marine Services, we will now hear from you as the last case on our argument calendar for this morning or I should say for today. Do you have a chance to learn about Apprendi and Blakely and immigration law? Yes. Good afternoon, Your Honors. I'm Terrence Cox, representing the Pennsylvania Department of Justice.
judges: Alarcon, W. Fletcher, Rawlinson